STATE OF IOWA, appellee, v. PATRICK S. RUSSELL, appellant.

No. 48417.

(Reported, in 66 N.W.2d 35)

SEPTEMBER 21, 1954.

R. L. Fehseke, of Fort Madison, for appellant.

Leo A. Hoegh, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, and Robert N. Johnson, of Fort Madison, for appellee.

BLISS, J.—Donald Charles Fitterer, who was indicted with this defendant, was found guilty of first-degree murder, and, as provided in the verdict, judgment was entered committing him to life imprisonment in the State Penitentiary. On appeal to this court presented on a transcript of the record in the district court, made by the clerk of the court, the judgment was affirmed. State v. Fitterer, Iowa, 62 N.W.2d 914.

Defendant was born April 10, 1928. He never married. His mother died January 29, 1951. His father was living but he did not know where, and had not seen him since July 1952. He had four living brothers and six sisters, but did not know where any of them lived, nor the married names of his sisters. His school attendance did not go much beyond the eighth grade. Most of his schooling was received in Eau Claire, Wisconsin, but after the family moved to Chicago, Illinois, in 1941, he attended Carpenter Public School until his senior year when he was taken out to help his mother. He had worked in restaurants, and in the summer of 1952 was employed by the International Harvester Company in the plant in Chicago, until June 26, 1952, when he quit work there.

Defendant first met Fitterer, who was then going under the name of Dale Johnson, on Monday, June 16, 1952, at Wimpy's Hamburger Grill, at Randolph and Wabash, and they were together until 12:30 that night. They met again at ten o'clock the next morning at the Ringside Ranch at 5 North Clark Street and were together until three o'clock in the afternoon. They

met again at the same place the following Thursday, June 19. Defendant remembered the date because he hocked his watch and ring that day. They separated at the Ringside Ranch early Friday morning, June 20. The chance acquaintance ripened into a close companionship, as indicated in defendant's signed statement of September 29, 1952, to wit:

"I didn't see Johnson again until the following Monday [June 23, 1952]. After that day I saw Johnson almost every day. We nearly always met at the Ringside Ranch. Johnson didn't have any money, and I was supplying drinking money for both of us. This close association between me and Johnson continued until a week ago today. I haven't worked since June 26, 1952. Following that, I lived off my roommate, Ralph Schloegel, at 8605 South Marshfield, Chicago. I moved out of that address on September 10, 1952."

This written statement of September 29, 1952, was a summary of an interrogation of defendant in the Judge's Chambers in the Lee County courthouse. As defendant would reply to the questions of County Attorney Robert N. Johnson, the latter would summarize the answers to the typist. There were five others present during the interview who signed as witnesses to the defendant's signature. Hereinafter we will refer to this statement as Exhibit 4.

On September 26, 1952—the day of his arrest—at the Detective Bureau in Chicago, defendant was questioned by Robert Blair, of the Bureau of Criminal Investigation at Des Moines, in the presence of Mr. Mosley, deputy sheriff of Lee County, and two Chicago policemen, all of whom witnessed the signature of the defendant to this statement, Exhibit 3.

On November 25, 1952, defendant, at his request, made another statement (Exhibit 5) which was summarized to the typist by the County Attorney, which defendant said was "to clarify" a few matters in his two earlier statements. His signature to this paper on November 26, 1952, was witnessed by three others.

Defendant was his only witness. He testified that Johnson —as he then referred to him—on August 6, 1952 (Wednesday)

asked him if he could get money enough to make a trip to Muscatine, Iowa, with him to see his ex-wife and his six-year-old daughter, and defendant told him he would go if he could borrow the money from his roommate, Ralph Schloegel. Our further statement of facts will be made without always designating the notation of the item in any of defendant's statements or in his testimony. About 8:30 on August 7 defendant borrowed the money from Schloegel and a few minutes later so informed Johnson. In the latter's car they drove to a liquor store and Johnson cashed a check, which was not payable to him, for $19, and bought a half pint of liquor and four packages of cigarettes. A little later about 10:30 p. m. Johnson stopped the car and came back in about fifteen minutes with a nickel plated, five chamber .32 caliber revolver, for which he said he paid $25. He said they could use it for target practice in Iowa. About two hours later defendant and Johnson left in the latter's 1939 Pontiac car. They crossed the Mississippi River into Iowa at Burlington at approximately eleven o'clock Friday morning, August 8. Shortly after arriving in Burlington, on the direction of Johnson, defendant went to a gun shop and bought a dozen cartridges loaded with .32 caliber copper-covered shorts, which he gave to Johnson, who then drove the car to Fort Madison. They went into a barbershop and for the first time defendant heard his companion addressed as Fitterer. After stopping at a tavern for awhile they went to the Lincoln Hotel about noon or a little later and defendant signed the register for himself as Pat Russell, of 939 West Cullom Street, Chicago, the address of one of his sisters, and signed the name Dale Russell for Fitterer. After registering they went to bed and slept until about eight o'clock that evening. What then took place is set out as follows in Exhibit 4, defendant's statement of September 29, 1952:

"When we got up, we got in his car and drove to Burlington. Johnson drove to West Burlington. However, before we left the Lincoln Hotel and while we were still in there, Johnson told me the real purpose of our trip. Johnson said we could make some easy money through the armed robbery of several groceries in the little towns in Iowa. He named Burlington and

Muscatine. The reason for going to West Burlington was that Johnson said he knew about a grocery there. * * * We went to a neighborhood grocery store where there was a grocery and a house attached and found an old man and an old lady. The old man had crutches. Johnson told me he had lived about two blocks from there. We entered the grocery and Johnson walked around one side of the counter and I stayed on the other. Johnson pulled a gun on the old man and the old man laid a roll of bills on the counter, which I picked up, and then Johnson went to the cash register. There was $41 in bills and Johnson got $5 in change out of the cash register. The old man didn't say anything at all so I don't know whether he recognized Johnson or not. I was standing near the old lady who said she was going to call the police and as she stepped around to do so, she stepped right into my arms and I put my arms around her to prevent her from calling. I was not armed. Johnson then ran out the front door and called to me to follow, so I followed. We then drove back to Fort Madison."

In defendant's question-and-answer statement of September 26, 1952, Exhibit 3, the holdup of the grocery in West Burlington is not mentioned. As a witness, defendant's testimony of the above noted robbery was substantially as stated above in Exhibit 4, except that he said he did not pick up any of the money, as noted therein. The old couple who operated the grocery were Mr. and Mrs. James Jasper Hall. They were witnesses for the State. Mrs. Hall testified that defendant held her and that the other man had a mask on his face. She said the loss was $55 or $60. Mr. Hall testified that Fitterer used to deliver pastry to them, but he had a mask on his face and he did not recognize him. He said: "While Fitterer was sticking his gun at me his companion was holding my wife. She said, 'I will call the police', and she turned around and started and this guy caught her and held her. * * * Fitterer came behind me and said 'This is a stick-up' in a low voice. He was masked and took the money. Russell didn't say anything to me. He did not have on a mask."

Defendant, as a witness, testified that on their return to Fort Madison after the grocery holdup they went back to the

Lincoln Hotel, and "the money that was obtained from the robbery was put on the bed along with the money we had in our pockets and split 50-50. I took half the money from that robbery. Then we went to bed. On Saturday, August 9, we got up between eight and nine."

In Exhibit 4 there is also a statement of the equal division of the money taken in the robbery at the grocery and of the cash in their pockets, and of their equal contribution to all money used for expenses.

When they arose Saturday morning at the Lincoln Hotel in Fort Madison and had breakfast about 9:30 Johnson drove to Wapello to have the water system of his car repaired. When this was done about three o'clock in the afternoon they drove to Muscatine and visited with Johnson's former wife for a half hour or more and then drove to Davenport and registered at a cheap hotel about one o'clock Sunday morning, August 10, and slept there until about noon. Defendant registered as Jack Williams and he did not recall under what name Johnson was registered. After dinner they drove to Fort Madison so Johnson could see some persons, and then went to Muscatine and drove around until about nine p. m. and stopped at a building with a grocery store in front and living quarters in the back. Both of them went in the store and there were some people there, and they bought a package of cigarettes and then went out and sat in the car for about twenty minutes and then returned to the store. What took place is thus described in Exhibit 4:

"At that time, there was only a man and his wife in the store. Johnson pulled a gun on the man and the man called Johnson a * * * [vile name]. The man picked a can of peaches up and threw it at me [defendant] and hit me on the head with it and then threw a bunch of bananas at me. Johnson fired at the man and I believe the lady fainted. They were not an old couple but a young couple. We didn't get any money at this store at all. We then drove back to Burlington. We looked for a grocery store in Burlington but didn't find any. We drove around until almost midnight and Johnson's car broke down by the bridge in Burlington. We started to walk

across the bridge to Gulfport, Illinois, and a car stopped and gave us a ride."

Jake T. Friedley, the owner of the Friedley Grocery Store as a witness for the State testified to the attempted robbery of his store on August 9, 1952, to wit: "I recall that evening. About 9 o'clock two young men entered the store. One with a gun and one without. The one with the gun walked over to my counter and said, 'Stick them up'. I didn't obey * * * and he told the other boy to get the cash and as he came around to get the cash I slugged him and asked my wife where the gun was and the boys turned around and left. The shorter one fired the gun. The assistant chief of police extracted the bullet from the wall." Defendant was the taller of the two.

Of this unsuccessful robbery, defendant testified at his trial thus: "We attempted to commit a robbery in Muscatine on a *Saturday evening*. Prior to going into that store I knew I was going with him [Johnson] for the purpose of robbing the store. Fitterer had the gun. He fired a shot there. During all of these things I am testifying to I never at any time had the gun in my possession. * * * Shortly after he [Fitterer] got in the car at Muscatine, I told him if he pulled that gun on anybody again, I was going to leave and hitchhike back to Chicago." (Italics ours.) Defendant testified that he was confused about some of the dates and places. This is one of them, it was not "Saturday evening." It was Sunday evening, August 10, 1952.

This attempted holdup is not mentioned in Exhibit 3. In that Exhibit and also in Exhibit 4, and in defendant's testimony, it is stated in substance: They arrived in Burlington from Muscatine about midnight, August 10, 1952—"We were headed across the river to Gulfport, Illinois, when Johnson's car broke down on the Iowa side of the river and we left it there and we hitchhiked a ride across the Mississippi into Gulfport, Illinois, and reached Upton's Tavern about 12:30 a. m., August 11, 1952; about 1:15 that morning at this tavern, I first met Charles Harrison when he came to where Johnson and I were sitting and demanded to buy us a drink. Neither of us had ever seen him before. He was very drunk. Johnson was

about half stiff at that time. I was feeling alright but was not drunk. Harrison bought us quite a few drinks. He asked if either of us could drive a car, and Johnson replied that he could. Harrison said he wanted us to drive him to Muscatine to get him a woman. Johnson told him he knew he could get him a woman there. We left about 2:30 in the morning of Monday, August 11th in Harrison's 1941 maroon-colored Mercury, with Johnson driving and Harrison sitting between us. Johnson drove across the bridge into Burlington and instead of going toward Muscatine he came out past the airport and headed towards Fort Madison. He drove until we came to a dirt road that connected the paved road we were on with a black top highway. I didn't know where Johnson intended to go. After getting on the black top paving we drove about five miles. Johnson and Harrison had been arguing about a bottle of whiskey I bought at Upton's Tavern and Johnson didn't want Harrison to drink any more of it. Johnson stopped the car on the black top pavement and went to the rear of the car and the next thing I heard was the report of a gun being fired and Harrison slumped over against me, and then Johnson put the gun to Harrison's head and fired another shot. Johnson then took seven dollars in paper money and couple of dollars in change from Harrison's pants pocket, and then took a wrist watch from Harrison's arm. I was still seated in the car. Johnson then said: 'Let's get out of here and get back to Illinois.' I told Johnson he had shot a man and we ought to get him to a hospital. [This last statement is in Exhibit 4, and in his testimony, but is not in Exhibit 3.] Harrison was shot about 4:30 in the morning of August 11th in Lee County about five miles north of Fort Madison. Johnson asked me to help get Harrison in the back seat. We put him on the floor between the seats. Johnson turned the car around on the black top and went down a dirt road where there was a new grade near a small bridge and the car became stuck in a mudhole. Johnson was going to drag Harrison across the road through the mud, but I helped him carry Harrison over in a field about fifty feet from the road and put him in a hole in a gully, and Johnson covered Harrison with some dried weeds and brush that

had been cut. Harrison was alive when we left him there because I could still hear him breathing. We could both hear him breathing and Johnson said that maybe we had better shoot him again. Another reason that Johnson wanted to shoot Harrison again was that Harrison only had seven dollars on him and Johnson was mad about that. I was arguing with Johnson that we ought to get Harrison to a hospital but Johnson wouldn't do it. I was afraid that Johnson would shoot me. I told Johnson not to shoot Harrison again, that Harrison would eventually die anyway." No mention is made in Exhibit 3 of defendant's insistence that Harrison be taken to a hospital, but in his testimony he stated: "At that time I told Johnson that he should try to get the boy to the hospital because he was still living, and that it wouldn't be right to just leave him lay. He said that if I didn't quit whimpering and crying that he was going to shoot me."

After hiding Harrison, defendant and Johnson, at about 5 a. m., went to a farmhouse near by occupied by Clarence Millard and he dressed and tried to pull the car out with a tractor, but was unable to do so without chains. Defendant said they told him to leave the car sit and they would get a tow truck at Fort Madison. They were dressed in yellow T-shirts and blue jeans. It was raining hard. As they hitchhiked along the road they stopped at several farmhouses to try to get someone to take them into Fort Madison and finally induced one to do so. Johnson offered three wet one dollar bills to their driver, which he declined. They went to the Lincoln Hotel where they registered as Pat and Dale Russell, ate breakfast and went to bed about 7:30 that morning, Monday, August 11, 1952. Defendant got up about noon that day and Johnson stayed in bed. Defendant went to a hamburger stand a block east of the hotel and ate and got a sandwich and coffee which he brought back to Johnson in the hotel room. They stayed in the hotel room the remainder of Monday and Monday night until about seven o'clock Tuesday morning, August 12, when they walked across the bridge to Illinois and hitchhiked to Chicago where they arrived about nine o'clock that night.

As noted herein, defendant, while in custody in Lee County

requested permission to make another statement. He made such a statement in the courthouse at Fort Madison on November 25, 1952, and signed it the next day. The following narration is from it:

"The purpose of this statement is to clarify and somewhat change the previous statements given by me, one in Chicago, and one here in Fort Madison. Actually there was no quarrel between Donald Fitterer and Charles Harrison over a bottle of whiskey. Fitterer just shot Harrison so that he could get Harrison's money and car. When we were in Muscatine shortly after we left Fitterer's wife's home, Fitterer told me he wanted to get hold of someone with a car so that he could take the car away from them to use instead of the beat-up Pontiac that we were driving. We both knew that the Pontiac would not stand the trip back to Chicago. Actually nothing was said between me and Fitterer as to taking the car of Harrison, but I knew that he had that intention in his mind at the time we started out with Harrison, to someplace for a girl and some liquor. I did not know that Fitterer had any intention to rob a grocery store until we reached Fort Madison and were in the Lincoln Hotel the night we started for West Burlington and robbed the grocery there. Fitterer gave no reason at all for the purchase of the gun in Chicago, as I have told before. The only reason he gave for sending me into the gun shop in Burlington to buy a dozen .32 caliber bullets for the gun was that we might have some target practice by the Skunk River, wherever that is. I did not have the gun in my possession at any time. Most of the time Fitterer carried the gun stuck in his belt under his T-shirt.

"Right after Fitterer shot Harrison, I asked Fitterer to take Harrison to a hospital but Fitterer refused and threatened to shoot me too. When we got stuck in the mud after Fitterer shot Harrison, Fitterer said that he intended to take Harrison's body across the river into Illinois and dump it out of the car along the road, but then he said the thing to do was to hide the body or get rid of it so we could use the automobile to get back to Chicago. I don't know for sure whether Fitterer intended to pick the body up from the place where we left it

after the farmer had pulled us out of the mud or not, but I do know he wanted the car. The next morning after Harrison was shot and when we were in the hotel, Fitterer said that he had intended to take Harrison's car to Burlington and get his license plates off his own car which we had abandoned there and put them on Harrison's car."

This Exhibit 5 also stated that when they left Chicago for the trip defendant had $27 which he had received from his roommate, and Fitterer had $34 of his own and a check for $19, that belonged to some Greek, which he cashed before leaving Chicago. Each of them carried his own money and they took turns at paying expenses. The statement concluded with the words: "Everything else in the previous written statements I have given is okay and true. I have read the above and foregoing statement and it is correct. I sign the same freely."

Charles Harrison and his mother, Agnes Harrison, operated a small grocery store in Shale City, Illinois. After dinner on Sunday, August 10, 1952, his twenty-fourth birthday anniversary, Charles Harrison left his mother's house in her car and told her he was going to the home of his brother, Robert, at Alexis, Illinois, about sixteen miles distant. That was the last time she saw him alive. He drove away from his brother's home about three o'clock that afternoon. The family spent the next two days trying to locate him. When his mother, on Wednesday, August 13, received notice of the finding of her Mercury car, she and her son Robert and his wife came to Lee County. Bloodstains were on the front seat cushions and between the front and back seats of the car. The mother found a sock in the mud which she recognized as belonging to her son Charles. On further search the body was found and identified as that of her son Charles K. Harrison.

In Exhibit 4 are these statements: "After we got back to Chicago, Johnson kept the gun around his house. A week ago today [September 22, 1952] I was at Johnson's house and Johnson had it on him all day. We left his house about 5:30 that day to go out and hold up a taxi driver, but I ditched Johnson and haven't seen him since. Last Friday [September 26, 1952] I was arrested. * * * After Harrison was shot, Johnson had

Harrison's wallet, and as we were walking along the road Johnson handed the wallet to me and later took it back from me. When we got to the hotel room, Johnson went through the wallet to see if there was anything of value. * * * Johnson threw the wallet from the bridge into the Mississippi River. Johnson also kept Harrison's watch with him. Johnson sold the watch, I think to one of the pawnshops in Chicago. I don't know what became of the gun that Johnson had, other than that I later heard through the officers that it had been sold. I can identify Johnson's gun which he used in killing Harrison because it had two chips out of the bottom of the handle and there were two nicks on one side of the handle of the gun. Also the nickel is coming off the gun in spots."

The autopsy by the coroner on August 13, 1952, showed one bullet entered Harrison's head just in front of the left ear and came out on the right side of the neck. This bullet was found in the front seat of the Mercury car. According to the opinion of the ballistic expert this bullet and the bullet imbedded in the wall of the Friedley Grocery were fired from Fitterer's gun. Another bullet hole in the head of Harrison was just back of the left ear. The bullet was found about in the center of the frontal lobe of the brain. Death was due to intercranial hemorrhage. It was the doctor-coroner's opinion that either bullet could have caused death. The bullet found in the brain was somewhat shattered, and there was not enough undisturbed surface on the fragment to enable the expert to conclude whether it was fired by the same gun as the other two bullets.

The revolver used by Fitterer and defendant in the robberies herein referred to, and in the killing of Harrison, was secured by Robert Blair, special agent with the Iowa Bureau of Criminal Investigation, and Chicago peace officers at 1416 East 50th Street in Chicago, the room of LeRoy Bates, who had received it from Fitterer. When the question-and-answer statement of defendant (Exhibit 3) was taken in Chicago by Mr. Mosley, deputy sheriff of Lee County, and by Robert Blair, as interrogator of defendant, the latter described the revolver. He said he saw it in Johnson's possession when he bought it on August 7, 1952. The following is from Exhibit 3:

"Q. Patrick, I now show you a .32 caliber nickel plated Iver Johnson break-open revolver, serial No. 51123, and ask you if you ever saw this gun before? A. Yes, I did.

"Q. Where and when? A. I saw this gun the day Dale Johnson bought it, and saw it practically every day after that, and that is the same gun that Johnson shot Charles Harrison with."

When defendant was arrested in Chicago he was using the name of Bruce Martin. Forty witnesses gave testimony for the State of the presence and actions of Fitterer and defendant at many places in Illinois and Iowa from August 7, 1952, until their return to Chicago, and the arrest of defendant on September 26, 1952, at Wimpy's Hamburger Shop in that city.

On August 12, Loren Harrison, an auto salvage dealer, as he was crossing the bridge over the Mississippi River picked up two hitchhikers whom he carried to La Harpe, Illinois. He later identified them as Fitterer and defendant. In talking to the defendant at the time of this identification, defendant said to the witness: "He told me I was lucky they didn't kill me too."

Clarence Millard, who tried to pull the car out of the mud-hole for Fitterer and defendant, when the latter was brought to him for identification, said: "I believe I have seen him before", and defendant said: "You sure ought to; another guy and I got you out of bed at a quarter to five when it was raining like the devil."

Ivan Franklin, an Iowa Highway Patrolman, was present on August 13, 1952, at the place where the car had become mired, and where the body of Charles Harrison was found. Later he and Deputy Sheriff Mosley took defendant to the same locality and defendant accompanied them to the place on the black top highway two miles north and about a mile and a half west from where the body was found, and then told them that was where the shooting was done.

Several witnesses were present during the times when defendant was being questioned and was answering, and when he read over and signed the statements, Exhibits 3, 4 and 5, and all of them testified that he did so freely and voluntarily without any promises of favors or threats of harm of any kind.

I. We will comment but little on the evidence. It is herein stated with some fullness and speaks for itself. It fully sustains the findings of fact implicit in the verdict. The reasonable conclusion from a consideration of the evidence is that these two young men, being low in funds and desirous of acquiring what they termed "easy money", conceived and planned this joint criminal undertaking into Iowa. The story defendant told the jury that he, being without money, was induced or entrapped by his boon companion, who then had a wife about to become a mother in Chicago, to borrow money from his roommate, to finance a trip to Muscatine to enable his companion to visit his "ex-wife" and his six-year-old daughter, when considered in the light of all other evidence, carries no conviction of its truth. The visit to the former spouse on the second day of the trip was of thirty minutes duration and no call was made on the little girl at a farm close by. Defendant in his written statements, and more so in his testimony, sought to show that his companion was the real and only criminal and the moving and dominating spirit in the venture, and that such part as he took was because of the compelling threats upon his life by the other. The evidence establishes beyond reasonable doubt that from the inception of this criminal venture to its termination the defendant was an aider and abettor to, and a full and active participant with, Fitterer in its prosecution. Even after their return to Chicago they set out, with the same gun that was used in killing Harrison, to find a taxi driver to rob. Fitterer furnished the gun but defendant bought the bullet that took Harrison's life. He took an active and efficient part in the robbery of the Hall grocery. He was present and ready to give aid in the fruitless attempt to rob the Friedley store. He cruised about in the car with Fitterer in search of other stores to rob. He shared equally in the booty of their robbery and he contributed equally of his money for the expense of their undertaking. He knew of their need to get a more efficient automobile to prosecute their criminal endeavors, and he stated that after the short visit with the former wife of Fitterer that the latter told him "he wanted to get hold of someone with a car so he could take the car away from him to use instead of the beat-up Pontiac that we were then driving."

1204

Harrison was the unfortunate victim who presented himself. Defendant knew when Fitterer as the driver of Harrison's car upon reaching Burlington turned south onto a country road instead of proceeding to Muscatine to get Harrison a woman, that their purpose was to unlawfully possess themselves of his car. As defendant stated in Exhibit 5: "Actually, there was no quarrel between Donald Fitterer and Charles Harrison over a bottle of whiskey. Fitterer just shot Harrison so that he could get Harrison's money and car." But as a witness he said he did not know of Fitterer's intentions until after the shooting. The seven dollars taken from Harrison were not split between defendant and Fitterer in currency, but were used for their joint and equal benefit.

There is no sound basis for defendant's contention that the verdict and judgment are not sustained by the evidence.

II. Defendant complains of many of the court's instructions. We have carefully read all of them. They fully and fairly instructed the jury on all pertinent questions of law and adequately protected the rights of the defendant. A discussion in detail of the complaints and the instructions would unnecessarily lengthen this opinion and serve no purpose. The challenges are without merit. The evidence establishes beyond reasonable doubt that defendant was an accessory before the fact in the commission of the murder of Harrison, and that he was rightly indicted and tried as a principal in the crime charged, under section 688.1 of the 1950 Code of Iowa, and that although he did not fire the shot that killed Harrison in the perpetration of their robbery of the latter's automobile, he so participated in both crimes, that he was guilty, under the law, of the crime for which he was indicted and convicted. Extensive citation of authority on these propositions is unnecessary, but see sections 690.1, 690.2, Iowa Code of 1950; State v. Storms, 233 Iowa 655, 10 N.W.2d 53; State v. Kneedy, 232 Iowa 21, 3 N.W.2d 611; State v. Lyons, 202 Iowa 1195, 211 N.W. 702; State v. Carlson, 203 Iowa 90, 212 N.W. 312; State v. King, 198 Iowa 325, 197 N.W. 981; State v. Wilbourn, 219 Iowa 120, 257 N.W. 571; State v. Davis, 191 Iowa 720, 183 N.W. 314; State v. Wallack, 193 Iowa 941, 188 N.W. 131.

III. Defendant assigns error because the court did not instruct the jury on his testimony that his presence at the time of the killing of Harrison, and his participation therein, if any, and any part he took in the concealment of the crime or in the hiding of the body, were because of duress by Fitterer, and threats of the latter that he would kill him if he did not do so.

The only plea of defendant was that of "not guilty." His testimony in support of this contention was weak and far from convincing in the light of all the evidence. The preponderance of the evidence was to the contrary. This claim was not called to the court's attention in any way, by requested instruction, or otherwise. We have many times held, from our earlier decisions to our recent ones, that a party desiring additional or more explicit instruction should request it. Defendant's failure to present an instruction on this matter or to make known to the court his wish to so instruct deprives him of a basis for successful appeal in this court for such failure to instruct.

The trial court, after instructing generally on the law of the case, ought not to give undue prominence to particular evidence, particularly so in the absence of any request therefor. State v. Albertson, 237 Iowa 1148, 1153, 1154, 24 N.W.2d 395; State v. Brandenberger, 151 Iowa 197, 206, 130 N.W. 1065; State v. Schenk, 236 Iowa 178, 195, 18 N.W.2d 169; State v. Stevens, 67 Iowa 557, 559, 25 N.W. 777; State v. House, 108 Iowa 68, 72, 73, 78 N.W. 859; State v. Jones, 145 Iowa 176, 178, 179, 123 N.W. 960.

It is our conclusion that the judgment should be, and it is, affirmed.—Affirmed.

All JUSTICES concur.